UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT ANDREW COOPER<br><br>Defendant. | Case No. 25-CR-85 CJN |

### DEFENDANT'S MOTION TO DISMISS THE INDICTMENT

Robert Andrew Cooper, through counsel, moves to dismiss the indictment filed against him. The indictment in this case violates Mr. Cooper's First Amendment right of free speech by attempting to criminalize protected speech and, also violates his due process rights under the Fifth Amendment to the United States Constitution. Therefore, the Indictment must be dismissed.

### INTRODUCTION

The Indictment in this case charges Mr. Cooper with two counts of violating 18 U.S.C. § 875(c) (Interstate Communications with a Threat to Kidnap or Injure). Section 875(c) punishes any individual who transmits in interstate commerce "any communication containing any threat to kidnap any person or any threat to injure the person of another." 18 U.S.C. § 875(c). Mr. Cooper called the FBI and said that he "want[s] to kill Christopher Wray." Later, while on the phone with a Task Force Officer, Mr. Cooper stated that he "want[s] to kill [MPD Detective Shinton]." As discussed below, criminal charges may be based on true threats, *Virginia v. Black*, 538 U.S. 343, 359 (2003), and Mr. Cooper's comments do not rise to the level of true threats. Rather, his speech is protected by the First Amendment as a matter of law. For these reasons, the indictment in this case must be dismissed.

### QUESTION PRESENTED AND BRIEF ANSWER

1

Whether Mr. Cooper's statements to an FBI National Threat Operations Center ("NTOC") employee that he wants to "kill" the director of the FBI and whether his statement to a Task Force Officer that he wants to "kill" an MPD detective, while he has no plans to do so, constitute a true threat sufficient to strip First Amendment protection of freedom of speech.

Mr. Cooper's statements were not true threats because no reasonable person could find them to constitute a serious expression of an intent to commit an act of unlawful violence. Therefore, Mr. Cooper is entitled to First Amendment protection, and the indictment should be dismissed.

## FACTUAL BACKGROUND[1]

The indictment charges Robert Andrew Cooper with two counts based on his alleged communications that stem from three December 30th phone calls. Mr. Cooper called the Federal Bureau of Investigation's (FBI) NTOC and had two ten-minute conversations with two intake specialists. First, Mr. Cooper clearly identifies himself with his name, phone number, date of birth, and address. Mr. Cooper called the FBI to report crimes, stating that he knows of multiple people trying to kill Christopher Wray. During the course of these conversations, Mr. Cooper said that Christopher Wray's life is in extreme danger and that he wants to "kill him."

When asked, Mr. Cooper said that he has "homicidal ideations" regarding killing Mr. Wray, but that he is too busy to work out the details. The operator asked if Mr. Cooper has any weapons in the house, to which he responded "yes, my hands." Mr. Cooper then confirmed that he has no firearms or other weapons in the home. Mr. Cooper was then asked if he has any plans or intentions to kill Christopher Wray, or if he only had homicidal ideations. Mr. Cooper

---

[1] Given the nature of this Motion, the facts as stated in the Indictment are deemed to be true. *United States v. Lattimore*, 215 F.2d 847, 851 (D.C. Cir. 1954). Thus, for purposes of this Motion, and without waiving his right to put the government to its proof in the event this Motion is denied, the communications set forth in the Indictment will be referred to herein as having been made by Mr. Cooper.

responded by confirming that he had no plans, just ideations, saying that it was "mental masturbation. Verbal masturbation." He reiterated that in his busy schedule he did not have the opportunity to go make specific plans.

After this initial phone call, Mr. Cooper calls the FBI again and is connected to a different operator. Once again, he gives all of his identifying information. During this subsequent conversation, there is no mention of Christopher Wray. Rather, Mr. Cooper references a 2018 meeting with an FBI Special Agent in the Nassau County Jail, tapes of missiles going into the Pentagon on 9/11, and a 1986 Los Angeles murder where the ringleader was never charged.

On December 30, 2024 at approximately 2:26pm, Task Force Officer Jordan Katz called Mr. Cooper. Officer Katz asked if Christopher Wray was in any danger from Mr. Cooper. Mr. Cooper said "no. I'm too busy." Mr. Cooper asked Officer Katz if he has any relationship to "Shithead Shinton," referring to Washington D.C. Metropolitan Police Department Detective Matthew Shinton. When Officer Katz said that he knew Detective Shinton, Mr. Cooper said that he wanted to "kick his ass. I want to kill him." Officer Katz asked Mr. Cooper if he planned to do anything to Detective Shinton. Mr. Cooper responded "if I see him I'm gonna punch him in the face. I'm gonna sue him."

Officer Katz asked if they could plan to meet when Mr. Cooper got to Washington D.C. the next day. Mr. Cooper gave his date of birth, confirmed that they could meet the following day, and told Officer Katz that he liked him. At no point did Officer Katz seem concerned that Mr. Cooper's statements amounted to actual threats. Indeed, he seemed frustrated when Mr. Cooper continued talking despite Katz's attempts to end the call.

During the course of Mr. Cooper's three conversations (which he initiated) with law enforcement personnel, Mr. Cooper never expressed any tangible plans to commit a violent act.

In fact, he expressly stated that he did not plan on acting on what can only be described as vague desires. Nevertheless, Mr. Cooper was arrested in December 31, 2024 and charged with two counts of 18 U.S.C. § 875(c).

## LEGAL STANDARD

At is whether Mr. Cooper's phone calls fall within the narrow true threats exception to the broad protections of the First Amendment or whether they are protected speech. Whether the Government has infringed a defendant's rights is a question of law to be decided by the Court. *United States v. Popa*, 187 F.3d 672, 674 (D.C. Cir. 1999). Given the First Amendment's protection of speech that does not constitute a true threat, Mr. Cooper's case should be dismissed as a matter of law for the Government's failure to state a claim.

"A party may raise by pretrial motion any. . . request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Specifically, if the basis for the motion is readily available, defense may submit a motion for failure to state an offense for the Court to rule on before trial. Fed. R. Crim. P. 12(b)(3)(B)(v). In considering a motion to dismiss under Rule 12, the Court is bound to accept the facts stated in the indictment as true. *United States v. Lattimore,* 215 F.2d 847, 851 (D.C. Cir. 1954). The D.C. Circuit has upheld dismissals of counts in indictments based on questions of law. *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005).

## ARGUMENT

**I.     The First Amendment protects speech that most find distasteful.**

"The First Amendment commands, 'Congress shall make no law ... abridging the freedom of speech.' The government may violate this mandate in many ways ... but a law

imposing criminal penalties on protected speech is a stark example of speech suppression." *Ashcroft v. Free Speech Coalition,* 535 U.S. 234, 244 (2002) (citations omitted).

Of course, the government may penalize certain narrow categories of speech such as true threats, fighting words, obscenity, incitement, and libel. *See Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 103 (1972) (Burger, concurring) (noting the limitations on First Amendment protections). The Supreme Court has cautioned that where a statute "makes criminal a form of pure speech, [it] must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States,* 394 U.S. 705, 707 (1969).

Threats that do not constitute a true threat are protected under the First Amendment and are not punishable as crimes. *Counterman v. Colorado*, 600 U.S. 66, 69 (2023). The *true* in the term distinguishes speech that, taken in context, does not convey a real possibility that violence will follow. *Watts*, 394 U.S. at 708. Thus, to be a true threat outside of First Amendment protection, the speech at issue must be a "serious expression" conveying a speaker's means of "intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359.

In determining whether a communication is a true threat, courts "consider context, including the effect of an allegedly threatening statement on the listener." *Planned Parenthood of the Columbia/Williamette, Inc. v. Am. Coalition of Life Activists,* 290 F.3d 1058, 1075 (9th Cir. 2002); *see also Watts*, 394 U.S. at 708 (considering the context of defendant's speech in determining that his remarks, stated at a political rally, constituted protected political hyperbole, rather than a true threat). Importantly, the existence of a true threat depends not on the mental state of the author, but on what the statement conveys to the listener. *Counterman*, 600 U.S. at

74. The Government must show that a "reasonable person would understand [defendant's] statements as threats." *Id*. at 82. Importantly, courts determining whether communications constitute true threats must apply an objective standard. *See Planned Parenthood,* 290 F.3d at 1074-5 (collecting cases from all circuits). Thus, this court must consider whether a reasonable person would consider the statement a serious expression of an intent to commit an act of unlawful violence to a particular individual.

In examining context, factors to be considered include: the reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made similar statements to the victim in the past; and whether the victim had reason to believe the maker of the threat had a propensity to engage in violence. *United States v. Dinwiddie,* 76 F.3d 913, 925 (8th Cir. 1996) (citations omitted); *see also United States v. Kosma,* 951 F.2d 549, 553-54 (3d Cir. 1991) (noting that alleged threats must be analyzed in context); *United States v. Carrier,* 672 F.2d 300, 305 (2d Cir. 1982) (same).

Additionally certain groups, due to their role in society, are expected to exercise a greater degree of fortitude when it comes to offensive speech. *Matter of M.W.G.*, 427 A.2d 440 (D.C. 1981). Thus, "the circumstances under which words are spoken are of critical importance in deciding whether the Constitution permits punishment to be imposed." *Williams v. District of Columbia*, 419 F.2d 638, 645 (D.C. Cir. 1968). Notably, "a *police officer* is expected to have a greater tolerance for verbal assaults… that might provoke or offend the ordinary citizen." *Matter of M.W.G.*, 427 A.2d at 442 (emphasis added).

II.     **The comments here are not true threats and cannot form the basis of a criminal threats charge.**

The comments made by Mr. Cooper on December 30, 2024 are not threats. And even if they were, they hardly rise to the level of true threats required to forfeit First Amendment protection. Rather, they are expressions of deeply felt emotions by a mentally challenged 68-year-old man, with no intention of acting on these emotions. Accordingly, the indictment should be dismissed as a matter of law.

The context surrounding Mr. Coopers statements demonstrate that his assertions were not true threats. *Planned Parenthood,* 290 F.3d at 1074.First, Mr. Cooper did not communicate directly with either of the targets of his alleged threatening statements, which weighs against finding that his assertions were true threats. *See Dinwiddie*, 76 F.3d at 925 (using the fact that the communication was communicated directly to support contention defendant's speech was a true threat). Second, both of the alleged targets of Mr. Cooper's alleged threatening statements are law enforcement officers, who are expected to have "thicker hide" such that speech that may offend the ordinary citizen does not similarly affect them. *See Matter of M.W.G*, 427 A.2d at 442 (noting when speech is directed towards those in the public eye, the threshold for what constitutes a true threat may increase). Additionally, there is no evidence that Mr. Cooper had made similar statements in the past, and neither of the alleged targets (or law enforcement investigating Cooper's statements) had any reason to believe that Cooper had a propensity to engage in violence. Officers calmly waited for Cooper to return to DC from California before interrogating or arresting him. No evidence suggests that officers made any attempts to have Cooper arrested or interviewed when he made these statements to police. And during the second statement, officers ushered Cooper off the phone—demonstrating that they did not believe his statements to be genuine threats of violence.

Further, no reasonable person could understand Mr. Cooper's statements to be serious expressions conveying an intent to commit an act of unlawful violence. Therefore, his speech cannot form the basis for a § 875(c) indictment. Mr. Cooper specifically said that he had no plans to kill Mr. Wray, describing his thoughts as "homicidal ideations." He did not possess any weapons (other than his hands), and when asked if he had "plans or intentions" to kill Mr. Wray, Mr. Cooper specifically said no: that they remain "mental masturbation." When discussing Detective Shinton, Mr. Cooper first called him "Shithead" before saying that he wanted to kill him. Again, when asked whether he had actual plans to kill Detective Shinton, Mr. Cooper responded that he "wants to kick his ass."

No reasonable person would understand Mr. Cooper's statements as a true threat to commit an act of unlawful violence. These statements are similar to the defendant in *Watts,* whose statement that he would sets the sights of his rifle on L.B.J. was ruled "hyperbole." Mr. Cooper had no plan or intention to kill. Speaking in hyperbole is protected speech, unreasonable for a person to understand as a threat. Mr. Cooper plainly said that he had no plans to hurt anybody. He was speaking in hyperbole. Should Mr. Cooper have made these statements to law enforcement? Certainly not. Are they reprehensible things to say? Absolutely. But this speech does not constitute a serious intent to commit an act of unlawful violence, and does not strip Mr. Cooper of his First Amendment rights.

### III. The Communications here do not fall under any other narrow exceptions to the First Amendment's broad protections.

As outlined above, the communications set forth in the indictment fall far short of true threats and are, therefore, protected speech under the First Amendment. It's also clear that neither of the other narrow carve-outs to First Amendment protection, namely fighting words and obscenity, apply here.

8

Fighting words fall outside the First Amendment's broad protections. Speech constitutes fighting words when it is likely to provoke an immediate violent response from the person to whom it is addressed. *Black*, 538 U.S. at 359. Whether speech is fighting words hinges on the reaction of the addressees to those words. *Texas v. Johnson*, 491 U.S. 397 (1989). Thus, courts are required to consider the circumstances surrounding the expression, and whether such expression is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 409.

Here, it's clear that Mr. Cooper's communications were not fighting words. They were stated on the phone to one individual – hardly likely to produce an immediate violent response. And they did not produce a violent response, as he was calmly arrested the following day at Dulles Airport. Because there was no intent to produce a violent response, and there was no violent response, his speech did not constitute fighting words and cannot form the basis of a criminal charge under that theory.

Additionally, Mr. Cooper's comments are not obscene. The rule that obscenity is unprotected applies only to material with erotic content. *Cohen v. California*, 403 U.S. 15, 26 (1971). "The statutory prohibition against profane or obscene language in public is constitutional only if interpreted to include the requirement that the language used created a substantial risk of provoking violence or was so grossly offensive as to constitute a nuisance." *Matter of M.W.G.*, 427 A.2d at 442.

Here, there is no evidence that Mr. Cooper's comments created a substantial risk of provoking violence or that they were so grossly offensive that they should be subject to criminal sanctions. Nothing he said was "obscene." Considering that his comments were neither fighting

9

words nor obscene, and they were not true threats, Mr. Cooper's communications cannot be punished under any of the narrow exceptions to the First Amendment.

## CONCLUSION

For the reasons set forth above, Mr. Cooper respectfully asks this Court to dismiss the indictment as a matter of law.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

*/s/ Alexis Gardner*
ALEXIS GARDNER
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500